UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

UNITED STATES OF AMERICA,

      Plaintiff,

   vs.                          Case No. 23-CR-39-WMC-1

GUSTAVO REYES,               Madison, Wisconsin
                               August 17th, 2023
      Defendant.          1:08 p.m. - 2:17 p.m.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STENOGRAPHIC TRANSCRIPT OF SENTENCING HEARING
HELD BEFORE U.S. DISTRICT JUDGE WILLIAM M. CONLEY

APPEARANCES

For the Plaintiff:
      United States Attorney's Office
      BY: AARON WEGNER
      222 West Washington Avenue, Suite 700
      Madison, Wisconsin 53703

ALSO PRESENT: MARIAH STIEVE, Probation Agent

For the Defendant:
      Jones Law Firm.
      BY: WILLIAM R. JONES
      P.O. Box 44188
      Madison, Wisconsin 53744

PHILIP C. HARRELSON, RMR, CRR
U.S. District Court Federal Reporter
120 North Henry Street, Room 410
Madison, Wisconsin  53703
1-608-261-5708
\*\*\*

<pre>
 1                  (Proceedings called to order at 1:08 PM.)

 2          THE CLERK:  The Unites States District Court for the Western

 3     District of Wisconsin is now in session.  Judge William M. Conley

 4     presiding.  Please be seated and come to order.

 5          Case No. 23-CR-39-WMC-1: *The United States of America versus*

 6     *Gustavo Reyes*.  The Court is called for a sentencing.  May we

 7     have the appearances, please.

 8          MR. WEGNER:  Good afternoon, Your Honor.  Aaron Wegner on

 9     behalf of the United States.

10          MR. JONES:  Mr. Reyes is here in person and with his

11     attorney, William Jones.  Good afternoon.

12          THE COURT:  Good afternoon, all.  We are here for the

13     sentencing of Gustavo Reyes, and I note that the -- you seem to

14     be -- the -- I was about to note, before we go any farther, that

15     the defendant is to be assisted by a translator, but we seem to

16     have an issue with the translator coming out on the wrong place

17     in our system.  So we'll go off the record and see if we can't

18     correct that.

19             (A break in proceedings from 1:09 to 1:18 PM.)

20          THE COURT:  All right.  We're back on the record.  And I

21     understand, Ms. Garcia Heinz, that we now have you, and you are

22     able to assist Mr. Reyes.

23          Mr. Reyes, I'll just confirm you're able to hear, properly

24     now, the translation?

25          THE DEFENDANT:  Yes, I can hear well.
</pre>

THE COURT: Very good. Then Ms. Garcia if you -- or Garcia Heinz, if you would be good enough to raise your right hand, and we'll swear you in.

**INTERPRETER SWORN**

THE COURT: All right. And, Mr. Reyes, you're able to follow along. We'll swear you in in a minute, but I just want to confirm that you -- you are following along now.

Let's try it a different way. Let me just ask --

THE DEFENDANT: Yes. Thank you.

THE COURT: Okay. I just want to confirm with you that you've had an opportunity to read and discuss with your counsel the presentence report, the addendum to the report, and the revised presentence report?

THE DEFENDANT: Yes, I was able to.

THE COURT: And in addition, I'll confirm the government is moving for an additional one level of reduction for acceptance of responsibility?

MR. WEGNER: Yes, Your Honor.

THE COURT: With those preliminaries and granting that motion, I will accept the plea agreement, finding that the offense of conviction adequately reflects the defendant's criminal conduct and the plea agreement does not undermine the statutory purposes of sentencing.

In determining the defendant's sentence, I will take into consideration the advisory sentencing guidelines and be governed

by the statutory purposes of sentencing set forth in Section 3553 sub.(a) of Title 18.  The defendant offered multiple corrections, clarifications, and objections to the presentence report.  All of the defendant's corrections and clarifications were included in the revised report and had no effect on the advisory guideline imprisonment range.

In addition, the defendant objected to the assertion he is only a Mexican citizen, since he is claiming, in unresolved immigration proceedings, to have been born in Texas.  Because current available records can only verify the defendant's Mexican citizenship, I will overturn this objection, but his assertions regarding citizenship have also been incorporated in the presentence report.  The double-edged sword of that assertion is that it makes his failure to pay income taxes even more egregious, but that will be addressed as part of sentencing.

Finally, the defendant objected to statements that he pressured Yuquetz Juarez and her husband to start a company with him as well as contacted Raquel Vasquez before her interview with law enforcement to instruct her on how to respond.  Because these witness statements were recorded in the investigative materials, they are appropriately included in the report; although, the defendant's denials are also now part of the revised report.  Accordingly, I will also overrule these objections.

Based on those rulings, I further find the probation office calculated the advisory guidelines correctly, using the current

manual and taking into account all relevant conduct under Section 1B1.3.

The guideline for tax evasion in violation of Section 7201, Title 26, is found at Section 2T1.1.  The base offense level is 20 under subsection 1.1 sub.(a)(1) and Section 2T4.1(h) because the defendant's relevant conduct involved a tax loss of more than $550,000, but less than $1,500,000.

No Chapter 2 adjustments apply; although, the defendant qualifies for the three-level downward adjustment to Section 3E1.1, having now accepted responsibility for his offense and the government having moved for the additional reduction.

With a total offense level of 17 and a criminal history category of I, the defendant has an advisory guideline imprisonment range of 24 to 30 months.  Typically, in white-collar crimes of this kind, the Court applies the guideline range -- or at least gives it substantial weight because they are so much lower than the penalties for virtually any other kind of crime.

I do understand the defendant's getting ever deeper into an industry that is notorious, along with farming, for use of illegal immigrants and perhaps somehow rationalizing his behavior as operating in gray markets, but I cannot find any justification for his continuing ignoring what was a remarkable effort by the IRS to handle this as a civil matter.  For years.  There's just no explanation.  And then to continue to double down, making

matters worse by not correcting his behavior and then ultimately -- although, not impacting the amount of tax due -- choosing to engage in the last-ditch effort to hide what he was doing by creating dummy corporations.

I'm not sure what the mitigating factor is here, but I haven't made a decision. I've certainly read the letters written on behalf of the defendant, and I don't doubt that he is a hard worker, that he is a good family man, that he does look out for others -- both in and outside his businesses -- but he really decided to just flout this nation's laws, and -- for no apparent reason other than, I guess, he thought he could get away with it.

With that said, I'll hear comments from counsel, beginning with the government.

MR. WEGNER: Nothing in addition to my memo. Thank you, Your Honor.

THE COURT: Mr. Jones, anything that you want to add?

MR. JONES: Yes. Thank you.

One, just to -- I guess a point within the guidelines that I would -- I think should make is that he's on the low end. In fact, if this amount was over the course of five years, just two percent lower, he would be two levels lower.

THE COURT: It was unclear to me the -- the accounting. It is -- the government agrees that the -- the 550,000 threshold -- or slightly above it -- and I have the actual accounting for the amounts owed at page 8 and 9 of the revised report -- they agreed

1    that there were no additional amounts owed after 2018?

2         MR. WEGNER:  That's correct, Your Honor.

3         THE COURT:  So he brought himself in compliance in 2019?

4         MR. WEGNER:  I'm not sure he actually even filed in 2019 and

5    beyond that.

6         THE COURT:  Oh, in 2019, he would have filed his two

7    thousand -- he would have been obligated to file his 2018?

8         MR. WEGNER:  Correct.  Yeah, I'm not sure that he actually

9    did that.

10        THE COURT:  That was the other question I was going to ask

11   you.  Are representatives of the IRS here, since they --

12        MR. WEGNER:  Yes, Your Honor.

13        THE COURT:  -- they obviously spent a lot of time trying to

14   make -- or get the defendant to pay.  I'm just trying to

15   understand what their view is of his tax obligations after 2018.

16        MR. WEGNER:  Do you want to speak to that?

17        THE COURT:  I'm not looking for exact.

18        MR. WEGNER:  Okay.

19        THE COURT:  I'm just looking for some guidance.

20             (A discussion is held off the record.)

21        MR. WEGNER:  So according to the IRS case agent, he has

22   filed additional tax returns starting in 2019, but he's never

23   actually paid any money towards what he owes for those returns.

24        THE COURT:  Which is a different question than calculation

25   of the loss amount, which is, I guess, Mr. Jones's point.  If

1     there would be a loss of a -- of two offense levels to 15, what

2     would the range be?

3          MR. JONES:  I believe it would be 18 to 24.

4          MR. WEGNER:  That would be correct, Your Honor.  18 to 24

5     months.

6          THE COURT:  All right.  I will certainly take that into

7     consideration.

8          MR. JONES:  Thank you.

9          THE COURT:  Anything more that you would like to --

10         MR. JONES:  Yes.  This was a case of Mr. Reyes, as he has

11    explained it to me, attempting to continue to work and finding

12    that when money would come in that wasn't all his, but would come

13    in, and he would handle it and then pay his -- the people that

14    were working with him -- it would get frozen, and he made a

15    solution that was a poor one.  You know, one thing he could have

16    obviously done --

17         THE COURT:  I'm confused on the timing of that.  It would

18    get --

19         MR. JONES:  Well --

20         THE COURT:  -- frozen by what?

21         MR. JONES:  -- if he -- if he was the -- the named person in

22    a business and that account was attached to his name --

23         THE COURT:  He was the named person in a business initially;

24    right?

25         MR. JONES:  Right.  But then he could not go through a bank

1    and pay his employees.

2        THE COURT:  When?

3        MR. JONES:  After the -- the tax -- the IRS put a freeze --

4    a freeze on his bank accounts.

5        THE COURT:  That doesn't explain why he wasn't paying taxes

6    to begin with.

7        MR. JONES:  No, but this case is involving him -- steps he

8    took to evade paying.  And so I'm focusing --

9        THE COURT:  How -- I don't understand.

10       MR. JONES:  -- on his offense conduct.

11       THE COURT:  The losses occurred -- are you talking about the

12   last efforts he made by --

13       MR. JONES:  Yes.

14       THE COURT:  -- creating dummy corporations?

15       MR. JONES:  Yes.

16       THE COURT:  That's the least of his concerns.  We're talking

17   about his failure -- long before he went into this last-ditch

18   effort to avoid execution, we're talking about years of not

19   paying income taxes.

20       MR. JONES:  I understand that.  I understand that, but --

21       THE COURT:  So I don't understand why we're -- what -- other

22   than that he didn't want to be responsible for paying additional

23   income taxes; so he started creating dummy corporations -- how

24   that's particularly relevant to the crime he committed, which was

25   despite being regularly told by the IRS that he's in arrears,

that he had tax obligations under the United States laws, that he continued to just ignore them.

MR. JONES:  As I understand it, he's been convicted of evading -- by doing these bank accounts, evading a tax obligation, and that is precisely the offense conduct that he's --

THE COURT:  And that's --

MR. JONES:  -- been charged with.

THE COURT:  -- confusing to me because the evidence of -- I mean, the evasion is refusing to pay income taxes.  The conduct you're talking about -- creating dummy corporations -- didn't even occur until 2020.  These are tax obligations between 2018 and -- 2013 and 2018.  Those are the losses here.

MR. JONES:  That was the debt.  That was the tax debt that prompted the lien on his bank accounts --

THE COURT:  And it's also the loss amount here.  Those loss amounts occurred before he started to play games with others to create dummy corporations.  Am I missing something here?

MR. JONES:  I think you are, Judge.

THE COURT:  Mr. Wegner, do you have a different view of the facts?

MR. WEGNER:  No.  I mean, I think you're -- I think you're both correct.  I mean, creating the dummy corporations helped him avoid paying the taxes that he owed for '13, '14, '16, '17, and '18.  So he was avoiding paying those taxes by creating these

dummy corporations, but he also failed to pay the taxes for those
years before that.  So I think the information incorporates all
of that conduct.

THE COURT:  I do as well.  I mean, certainly all to be
considered.

MR. JONES:  But --

THE COURT:  These were losses that he built up.

MR. JONES:  Yes.

THE COURT:  I agree that he's -- that he's -- I want to say
"triple-downed" because he refused to pay taxes to begin with, he
refused to respond to the IRS's repeated notices -- over years --
that he was not paying his taxes as required, and then he adopted
a practice of creating dummy corporations to keep doing what he
had been doing.  So the loss that was created is one that he
created over time and, ultimately, is relevant conduct to the --
the crime he ultimately chose to commit.

MR. JONES:  What -- what makes this $557,000 involves his
bank account issues because those -- much of those are fines and
penalties.

THE COURT:  No.  They're interest.  The taxes owed plus
interest.  The penalty -- what are the penalties?  What
additional penalties are we talking about?  It looks like it's
only -- even if we counted interest --

MR. JONES:  Okay.  Interest.

THE COURT:  -- accrued interest.

1      MR. JONES:  Sure.

2      THE COURT:  But not penalties.  What are --

3      MR. JONES:  Fine.  Then interest.

4      THE COURT:  What are the additional fines?

5      MR. JONES:  I withdraw the comment about fines.  I'm talking

6  about this -- this five -- this --

7      THE COURT:  And even if --

8      MR. JONES:  -- but it sees it as interest.

9      THE COURT:  -- we counted just interest, that's a small

10  percentage of the loss.  The loss is --

11      MR. JONES:  This table's tough to read.  I think --

12      THE COURT:  No, it's not that tough to read.  The loss is

13  balances for taxes owed of 550,000.  I don't know where the total

14  comes from.  I don't know if the probation officer can enlighten

15  us.  There's a --

16      MR. JONES:  I guess --

17      THE COURT:  -- reference to a total of 1,280,000.  I don't

18  know what that total represents, unless it's total liabilities.

19  But it doesn't -- it doesn't total the column of account balance,

20  but the vast majority of the loss is your client's failure to pay

21  taxes.

22      MR. JONES:  And just to respond to my point and where I'm

23  coming up with penalties is I'm using the chart that says

24  "accrued interest in penalties" that has, at the bottom of it,

25  $261,000.  That's how I'm reading it.  On --

1          THE COURT:  I don't know --

2          MR. JONES:  -- paragraph 22.

3          THE COURT:  -- what that refers to.  And maybe this is a

4     time where we should hear from the IRS agent because paragraph 22

5     seems to create odd numbers.

6          MR. WEGNER:  Come up.

7          This is IRS Special Agent Rob Martin.  He was the case agent

8     on the case.

9          THE COURT:  Were tax returns filed by the defendant for tax

10    years 2013 through 2018?

11         MR. MARTIN:  Without -- 2015 was not filed.

12         THE COURT:  But he did file returns in 2013, 2014, 2016,

13    2017, and -- I should say for the tax years.

14         MR. MARTIN:  Yes, correct.

15         THE COURT:  2013 through 2018 with the exception of 2015?

16         MR. MARTIN:  Correct.

17         THE COURT:  All right.  And as you look at the table on

18    pages 8 and 9 of the presentence report, what does the column

19    "account balance" represent?

20         MR. MARTIN:  So this was the amount of -- this was the

21    amount of tax due.  This number --

22         THE COURT:  And I understood this to be based on an IRS

23    audit; is that correct?

24         MR. MARTIN:  It is --

25         THE COURT:  I know there was an audit done for 2013 and

2014.

    MR. MARTIN:  So what that is is the IRS goes ahead and takes information that's sent to us.  And when you work a job, the employer goes ahead and sends us how much they paid that person.  Like, in a 1099 --

    THE COURT:  I'm trying to ask a straightforward question --

    MR. MARTIN:  Oh.

    THE COURT:  -- and I just want -- if you don't know the answer to it, that's fine.

    MR. MARTIN:  Okay.

    THE COURT:  But what do those amounts represent on account balance?  What is the number for 2013 -- $52,987 -- represent?

    MR. MARTIN:  This -- this was the tax due.

    THE COURT:  That had not been paid?

    MR. MARTIN:  Correct.

    THE COURT:  So that was the principal amount?

    MR. MARTIN:  Correct.

    THE COURT:  And that's true for each of the dates for the tax years represented in that chart; correct?

    MR. MARTIN:  Correct.

    THE COURT:  So what does the totals mean at the bottom?  Because if you total that up, you're not going to come to -- anywhere close to 1,280,000?

    MR. MARTIN:  No, that -- that number -- so there was a -- a giant figure -- initially, this started out in 2013 with a giant

tax amount, and we worked out a large offsetting expense when we worked with the defense.  We came up to, like, a fair number because it wasn't a true tax due, because it's, like, a government -- or it's a computer-created, like, tax due, and it didn't include his expense of what he paid, like, his contractors and employees.

THE COURT:  Understood.

MR. MARTIN:  So --

THE COURT:  So the balances were intended -- the total should really -- I should just ignore that entire --

MR. MARTIN:  You should --

THE COURT:  -- line.

MR. MARTIN:  You should ignore that 1.2 number.  But the --

THE COURT:  I'm sorry?

MR. MARTIN:  The 1.2 number -- 1,280,000 -- ignore that number.

THE COURT:  That's, like, a gross revenue number before --

MR. MARTIN:  That --

THE COURT:  -- legitimate deductions?  Or do you even know?  Let's just ignore it.

MR. MARTIN:  Just ignore that because this --

THE COURT:  All right.  Agree.

MR. MARTIN:  -- 2013 number used to be, like, a million, and we -- we worked it down 52,000.

THE COURT:  And this is something that was done with your

1    client, correct, Mr. Jones?

2         MR. JONES:  Yes.

3         THE COURT:  So there isn't any dispute that the vast

4    majority of the loss is not interest.  It is not fines or

5    penalties.  It is a complete disregard of his tax obligations.

6    The relevant loss here is -- is the vast majority of it.

7    Two-thirds is just a failure to pay taxes.

8         MR. JONES:  I think after that clarification, that's a fair

9    comment.  And so I will withdraw anything as it relates to

10   penalties and -- and I wasn't making that --

11        THE COURT:  Do you know, Agent, if any of these amounts here

12   represent something more than accrued interest?  Were there --

13   were there penalties included in the loss amount?

14        MR. MARTIN:  It was -- it was a -- it was interest is my

15   understanding.

16        THE COURT:  That was my understanding as well.  And with

17   that, I thank you for your time.

18        Did you want to clarify anything more with the agent,

19   Mr. Jones?

20        MR. JONES:  No.

21        THE COURT:  Is there something more you want to add?

22        MR. JONES:  I -- I was reading through --

23        THE COURT:  Maybe you could just remain for now so we -- go

24   ahead.

25        MR. JONES:  Reading the PSR, I have -- I had a similar

1    reaction to reading this as I did the first time I had this case.

2    I think that a large part of this whole matter with Mr. Reyes is

3    encapsulated in paragraph 10.  And it's only two sentence.  So

4    I'll just read it into the record.

5        It says, "On December 22nd, 2014, the IRS filed a tax lien

6    against --"

7        INTERPRETER:  Your Honor, if counsel could read more slowly.

8        MR. JONES:  Sorry.  I forgot.

9        THE COURT:  You have to remember we have an interpreter.  So

10   if you could be a little slower.

11       MR. JONES:  Yep.  I apologies.

12       THE COURT:  I would benefit from that as well.

13       MR. JONES:  Apologies.  I get fast sometimes.

14       Your Honor, that paragraph 10 says "On December 22nd, 2014,

15   the IRS filed a tax lien against the defendant in Dane County,

16   Wisconsin, for tax year 2013 to collect tax due in owing.

17   Between 2015 and 2019, the IRS sent multiple notices to the

18   defendant regarding tax deficiency assessments for the 2013 and

19   2014 tax years."  And the last sentence is "He never responded to

20   the IRS."

21       That -- that's really where he started his problems, by

22   ignoring these -- these letters.  I can't explain why he

23   wouldn't, but one potential, just getting to know him, is a lack

24   of sophistication and fear, as far as his immigration status,

25   staring at a very large number like that.  I'm sure he wishes he

1    had just picked up the phone and said "What's this all about?"

2    and "Can we work something out?"  It seemed that that's what they

3    were trying to do, and we have -- we have now reached at least

4    that goal through the plea agreement.

5         Paragraph 7 of the plea agreement says, "and he has agreed

6    to and has every intention to cooperate with the IRS in examining

7    all -- his records in determining a correct civil tax liability."

8    I'm sure that's all that they were hoping to do, and he could

9    have avoided this -- this day in court that he's facing.  And

10   I'm -- I know that he wishes he was, but I think that there has

11   to be at least a consideration of the lack of sophistication in

12   ignoring that --

13   THE COURT:  This is not -- this is not just a lack of

14   sophistication.  He's a businessman.  He was apparently running a

15   successful business.  And he wasn't just ignoring the IRS;

16   although, that's outrageous under the circumstances.  It was that

17   he continued to try to find some way not to pay his income taxes

18   to the point that at the end, he was even trying to enlist others

19   to create fraudulent corporations.

20        That's not unsophisticated.  It might be stupid, but it

21   wasn't unsophisticated.  It was the opposite.  He was a

22   businessman like many other businessmen who come before this

23   court to be held accountable for their crimes who chose to try to

24   find some way to beat the system.

25        MR. JONES:  In addition, I would -- I would point out that

at this stage, sentencing -- the Court takes into consideration
an acceptance of responsibility.  And I know that it took a while
for him to come around to it, but he provided unprotected
statements.  He came in voluntarily to explain precisely what he
was doing and how it worked.

THE COURT:  And he certainly should be credited for that.  I
agree.  I also am considering the fact that he apparently is
facing deportation.  That is both a double-edged sword, however,
because it makes it unlikely he'll ever be able to repay any of
the amounts he owes the IRS, to the extent he's deported, but he
is facing a detainer -- almost certainly a detainer that will
make him ineligible for certain programming as well as prerelease
that others in his situation would not face.

MR. JONES:  I appreciate you pointing that out.  I had that
down as, you know, in addition to him never having served any
time in prison before, this will be his first time.  And the
message is usually a little stronger under someone -- or at least
has a better chance of getting through to someone if it's their
first trip to prison.

I talked to -- to Mr. Reyes and -- along with a friend who
was helping interpreting, and she pointed out -- and I thought it
was a decent point -- is that he really does want to stay in this
country.  He's fighting.  He's trying.  He let this country down.
He feels obliged to make up -- make up for that, but he hasn't
run.

And he's known about this.  He didn't run in 2014 when he got the letter -- the first letter.  He ignored it.  I wish he -- I wish he had known an attorney and gotten involved in defending himself instead of letting it get so much more worse.

THE COURT:  Or, as you say, just negotiating his way out of the situation.  But with that said, he didn't, and here we are.

MR. JONES:  That's right.  He also could have run in November 2020 when he was asked to come in.  Instead, he came in, and he gave a statement.  And it doesn't sound to me like he lied to them.  Everything that he said was truthful and assisted in ways to develop this case.  He came in and pled to an information.  He didn't --

THE COURT:  Just in fairness, you're not really describing anyone different than the typical white-collar criminal that comes before me.  When they've finally been caught red-handed, they cooperate.  And the fact that he hasn't fled -- I don't know if you're not arguing against yourself, because I assume you would like your client to be able to self-report.

MR. JONES:  I do.  I do.  And that goes to arguing in favor of that fact too, that I don't think that he's a flight risk as it relates to how he's been dealing with this case.

THE COURT:  Understood.  Anything else that you want to add, Mr. Jones?  Obviously, I want hear from your client.

MR. JONES:  The only other short comment I would say is I did not provide a memo, because it probably would have just

advocated for his personality, and I think that the character letter spoke so well to that, that I didn't need to provide anything in addition to that.

THE COURT: And I thought the same thing and suspected that was your reason for acting the way you did.

I want to make one statement, Mr. Reyes, before I hear from you. And I am interested in anything else that you'd like to say beyond what you wrote to me.

I don't want to have lost in this process the fact that you seem to be a hard-working individual who came to this country to try to make a success of themselves. You seem to be a decent, if not a very good, father and family person. You seem to have friends in the community and among those with whom you worked who speak highly of you, and I am factoring all of those things in as well.

My -- my struggle in the -- don't take the comments that I've made as anything more than also being confronted with someone who just kept doubling down and making a bad matter worse and refusing to accept their obligations under our laws. I realize you work in an industry that people look to cut corners. This is not corner cutting. This was just flouting repeatedly the laws of the United States. And as with others who come before me with failures to -- with intentional efforts to defraud the United States, there has to be a consequence. And I hope you understand that.

THE DEFENDANT:  I understand it.

THE COURT:  Is there anything else that you want to add?
And you can speak up.  It's not --

THE DEFENDANT:  Well, Judge, I am addressing you once more,
asking your forgiveness.

THE COURT:  Go ahead, Ms. Garcia Hein -- oh, I'm sorry.
That was your translation.  I was just saying to the -- to
Mr. Reyes you should feel free to speak up in Spanish.  You won't
confuse anything in the courtroom.

I take it you're able to hear him quite easily, Ms. Garcia
Hein?

INTERPRETER:  Yes, Your Honor.

THE COURT:  All right.  I apologize for interrupting.  Why
don't you start from the top.

THE DEFENDANT:  Judge, I am addressing you once more in
order to ask for your forgiveness.

THE COURT:  And be sure to pause occasionally so that -- go
ahead, sir.

THE DEFENDANT:  On an opportunity to make amendments for my
lack of knowledge as to how to properly work a business.  It was
never my intention to disobey the law, and it was not my
intention to disregard the notices from the IRS.  I didn't know
how to handle the problem.

Like any other human being, I have made mistakes, and I ask
for a second chance in order to be able to learn -- to learn from

1    my mistakes.

2        I want to work, have an honest job in order to pay my debt

3    to the government.  I know that because of my ignorance, I

4    deserve to be punished, but I ask you to please don't send me to

5    serve time in jail, taking into account that I am ready here to

6    pay for my mistakes and assuming the responsibility for my

7    actions and bad decision making.  I have small children that

8    depend on me, and I wouldn't like to abandoned them.  But I

9    respect the decision that you will make in my case.  That's all.

10   Thank you.

11       THE COURT:  Mr. Reyes, thank you for that statement.  There

12   was one thing that you said in it that I'm just having a great

13   deal of trouble with; although, I am certainly considering the

14   fact that you still have two minor children that will be impacted

15   by a sentence.  Unfortunately, that is often the case, and it

16   doesn't necessarily outweigh repeated criminal conduct.

17       But you said you never intended to disobey the law.  I don't

18   understand how you can say that when you repeatedly lied, filed

19   sworn tax returns that said you had no additional tax liability

20   when you knew you did.  That wasn't just a mistake.  That was

21   repeated lies to the government; right?

22       THE DEFENDANT:  Well, lies such as -- you know, answering

23   with lies, it's, like, no, I don't think so.  It was more that I

24   was going to fix it, but it was -- it went passing and time went

25   by, and I would tell myself "I have to fix this," and then time

went by, and then it got completely out of hand, and that didn't

help.  And I was -- I should have looked for somebody or some

guidance to try to fix this.

THE COURT:  And what you just said is even more concerning

to me.  You're not owning your own actions today.  Do you not

understand that you repeatedly lied in submissions to the

government?  Do you not accept that, or are you still trying to

say it was okay?

THE DEFENDANT:  No.  I'm sorry.  That's not right.  I

understand that it's not right.

THE COURT:  Part of the reason you got yourself into this

situation is you kept looking for some way out of it.  You -- you

did attempt to sell a substantial amount of drugs at one point in

your life; correct?  In the middle of your problems with the IRS.

You committed another crime by working with a confidential

informant to try to make money selling cocaine; correct?

There's no double jeopardy.  There's no Fifth Amendment

issue.  That's something he admitted to doing.  That's all I'm

asking you.  Is that not correct?

THE DEFENDANT:  Yes.  Yes, that's right.

THE COURT:  And even at the end of this situation, rather

than accept responsibility, you went out and tried to convince

others to create dummy corporations for you -- or companies for

you and bank accounts so that you could avoid responsibility;

correct?

1    THE DEFENDANT:  Well, yes.

2    THE COURT:  So to say you did not intend to disobey the law

3    or you did not intend to ignore the IRS notices is just not

4    correct.  I know you're trying to mitigate because you hope for a

5    lower sentence, but you have to accept responsibility for what

6    you did.

7    THE DEFENDANT:  Okay.  The story started back when we were

8    going to file taxes.  The person who was helping me to prepare

9    them passed away.  She passed away.

10   THE COURT:  And, Mr. Reyes, I'll let you tell this detailed

11   story if that's what you want to do, but you're missing my point.

12   There's a long, elaborate story behind it, but what there is not

13   is an acknowledgment by you of your part in this.

14   I know how you got deeper and deeper.  I know you made a

15   number of mistakes.  But you also intentionally violated the law

16   repeatedly and ultimately by creating dummy corporations.  You're

17   not a stupid man.  You knew the decisions you're making were

18   illegal.  And you're not helping yourself today.  You're just

19   digging a deeper hole by trying to explain it away as mistakes.

20   Do you understand that?

21   THE DEFENDANT:  Okay.  Yes, I understand.

22   THE COURT:  There is a consequence for that.  And I realize

23   that in some ways, you've lived much of your life -- although,

24   you may have believed you were an American citizen -- but lived

25   on the outside of legal behavior.  And much of that is

understandable and says a lot about the problems with our
immigration laws in this country and the way we allow entire
industries to operate outside of it.  And I will take that into
account as well, but you have to accept that there is a
consequence for the decisions that you made, which were just
blatant violations of the law.

Is there anything else that you want to add?

THE DEFENDANT:  No.

THE COURT:  I am prepared to render sentence.

The defendant was raised by his mother and stepfather in
Mexico.  He describes a positive childhood with the family's
daily needs met, but the siblings and he were required to work at
young ages to assist the family.  As a result, he left school in
the sixth grade.  And by the age of 15, he was working full-time
in landscaping, gardening, and construction.

After coming to the United States in his early 20s, the
defendant would return periodically to visit his family.  He has
been in a relationship with the mother of his four children for
approximately 27 years.  The youngest two are still dependents
and live with them in Wisconsin, which has been the defendant's
primary state of residence for more than a decade, if not much
longer, with short-term residencies in states while working
temporary construction jobs.

The defendant has worked in construction and specialized in
drywall his entire career, and he began his own drywall business

in approximately 2013.  By all accounts, he has been a good
father, husband, and friend to his community, some of whom he
helped at various times with work, food, and shelter.

From 2013 through 2020, however, the defendant substantially
underreported his income and exaggerated business expenses to
avoid paying income tax.  Despite the IRS contacting the
defendant repeatedly -- seeking tax payments owed, based on a
civil audit conducted in 2015 -- he ignored their efforts and
never paid.  He never even tried to work out an alternative.
Instead, he looked for ways to continue not to pay taxes.

In particular, he doubled down by soliciting friends to
create nominee entity businesses for him and open bank accounts
to operate his drywall company while continuing to evade his tax
burden.  During the timeframe alleged in the information, the
defendant failed to pay more than $550,000 in taxes and interest,
more than two-thirds of which became due in owing after he had
been first contacted by the IRS about his failure to pay taxes.

Aside from this ongoing criminal conduct, the defendant has
only one past conviction, committed at the age of 48, perhaps to
catch up on his mounting tax debts, by selling cocaine to a
confidential informant, who has been described as a -- or had
been described as a large-scale cocaine trafficker.

To his credit, the defendant completed two years of
probation without any violations, was discharged early this year
from that state conviction and, for the first time, discontinued

his flaunting of this country's tax laws.  In combination with the adverse effects of an immigration detainer on his eligibility for programming and prerelease, these factors argue for some reduction under Section 5K2.0 of the guidelines.

Now age 52, the defendant has no legal status in the United States and avoided paying taxes for years, devising and executing schemes to continue to conceal income illegally, long after the IRS began to contact him about his deception.  He also enlisted others in his scheme when coupled with his arrest and conviction for drug trafficking.  And despite having employable skills, and an apparently successful legitimate business, his behaviors and escalating attempts to evade detection from the IRS present concerns about his criminal rationalizations when faced with problems.

He reports no serious health problems, concerns with his mental health, or substance abuse that would explain his actions. Finally, now facing likely deportation at the end of his sentence, he is unlikely to ever repay his tax obligations.

I should say also for the record, although it was discussed, I am considering the fact that he's never been sent to prison before; although, this is almost always the case for white-collar criminals, particularly involving tax evasion.

Taking into consideration the nature of the offense as well as the defendant's personal history and characteristics, I am persuaded that a sentence at the bottom of the guideline range

is -- revised range -- is reasonable and no greater than necessary to hold the defendant accountable, protect the community, and provide him the opportunity for rehabilitative programs and achieve parity with the sentences of similarly situated offenders who have evaded the tax code.

As to Count 1 of the information, it is adjudged the defendant's committed to the custody of the Bureau of Prisons for a term of 18 months. I recommend that he receive educational, vocational programming while confined and at least be considered for prerelease; although, recognizing that neither may be available, given the likely detainer.

Although a term of supervised release is not required by statute, it is not entirely certain that the defendant will be deported; therefore, the Court has considered Section 5D1.1(c) and believes a term of supervised release would provide additional deterrence, enhanced protection of the community, and assist in restitution efforts.

Accordingly, a three-year term of supervised release will follow the defendant's term of imprisonment. In light of the nature of the offense and his personal history, along with the statutory mandatory conditions of supervision, I adopt Condition Nos. 1 through 19 as proposed and justified in the presentence report, noting that neither party has raised any objections to those proposals.

This offense is not drug-related; but given the prior drug

trafficking conviction as well as some history of illegal drug use, the requirement for drug testing under Section 3583 sub.(d) of Title 18 is not waived, and the defendant shall submit to drug tests during the first 15 days of supervised release and then 10 periodic tests thereafter as provided for in the proposed conditions.

As counsel's aware, there remains some question as to the Court's obligation to enter each of the conditions on the record verbatim and then justify them individually, and I would certainly do that unless the defense wishes to waive my doing so.

MR. JONES:  Mr. Reyes has had a chance to go over them.  He understands the conditions and their justification, and he would waive any reading of it or further justification beyond what's in the written PSR.

THE COURT:  If when the defendant is released from confinement to begin his term of supervised release, either he or the supervising probation officer believes that any of the conditions imposed today are no longer appropriate, either one may petition the Court for review.  It is adjudged that the defendant is to pay $100 criminal assessment penalty to the Clerk of Court for the Western District of Wisconsin immediately following sentencing.  He is encouraged to honor his agreement to pay this obligation by the day of sentencing.  A failure to do so may have an impact on him in federal prison.  Although, so too may a detainer.

The defendant is also to pay discretionary restitution in the amount of $557,907.19 to the U.S. Clerk of Court for the Western District of Wisconsin to be disbursed to the IRS at an address to be included in the judgment. However, the defendant does not have the economic resources to allow himself to make full payment of restitution in the foreseeable future under any reasonable schedule of payments. So under Section 3664 sub.(f)(3)(B), he is to begin making nominal payments of a minimum of $200 each month, beginning within 30 days of his release from custody.

The defendant shall notify the Court and the United States Attorney General of any material change in his economic circumstances that might affect his ability to repay restitution. No interest is to accrue further on the unpaid portion of the restitution so that the defendant can make a dent in those remaining debts. Moreover, the defendant does not have the means to pay any further fine under Section 5E1.2(c) of the guidelines without impairing his ability to support himself upon release from custody while paying restitution.

This leaves us with the Probation Office being directed to send the U.S. immigration and custom enforcement a copy of this judgment, to provide the Court with a copy, and the U.S. Probation Office being directed to notify local law enforcement agencies, the State Attorney General of the defendant's release back into the community if he is not deported.

1    I will ask, Mr. Jones, if I sufficiently addressed the

2    defendant's main arguments in mitigation today?

3        MR. JONES:  Yes.

4        THE COURT:  And separately advise you, Mr. Reyes, that you

5    have a right to appeal this sentence.  I did not enter it lightly

6    nor do I -- am I aware of a reason that the conviction should not

7    stand.  But Mr. Jones has very ably represented you.  I hope you

8    appreciate the efforts he's made, and he is still here to assist

9    you in deciding whether you want to file a notice of appeal.  You

10   only have 14 days to do so.

11       Finally, there is this question of the defendant's

12   reporting.  Both because he has young children, has been an

13   otherwise decent member of the community and is -- or has behaved

14   appropriately while on presentence supervision, I am inclined to

15   allow him the benefit of reporting.

16       There are two important benefits to that, the biggest of

17   which is that it would place him in a more appropriate facility.

18   And I think the defendant has earned that much, particularly

19   having cooperated with the IRS to try to arrive at an amount.

20       I do fear, however, the defendant's instincts, which have

21   not served him well and that may make him think that he's better

22   off running at this point rather than serving his sentence, and I

23   am concerned about that, and I assume that's the concern of the

24   government; although, they thought he should have been locked up

25   from the beginning.  Obviously, that was not correct.

1      So I will hear the government briefly if you want to make

2   any further argument.

3      MR. WEGNER:  No, Your Honor.  I just want the record to

4   reflect that the government does believe he should be remanded

5   today.  And I did want to point out too that according to the

6   PSR, the minor children that he has I believe reside in Mexico

7   with the mother, is that correct?  That's my understanding, but I

8   might be wrong on that.

9      THE COURT:  And I would appreciate direction from the

10  probation office on that point.

11     PROBATION OFFICER:  Yes, Your Honor.  Paragraph 48 of the

12  presentence report reflects that his adult children reside in

13  Verona, and his minor children reside in Mexico.

14     MR. WEGNER:  So I just wanted to make sure there was no

15  point on that point.

16     THE COURT:  And I was confused about that, and that does

17  raise my concern here.  What I will allow the defendant to do is

18  to self-report to the marshals today.  If you do that, you still

19  should get the benefit of a proper placement.  But the fact that

20  your -- your minor children are there and that you may decide

21  that there's no alternative is something that I -- I have to

22  consider.  I'm willing to -- to hear from the defense on that

23  topic as well.

24     MR. JONES:  Would it be possible to put him on an ankle

25  bracelet or some -- some other way and then report to the

marshals in a brief amount of time?  A couple weeks?

THE COURT:  The ankle bracelet would prevent much of a head start, but -- I guess I'd like to hear from you, Mr. Reyes.  You understand I -- I don't want you to make a bad matter worse, and we both know that there are ways to get to Mexico if you decide, "Well, this is too much."

And your -- your situation is not a good one, but it could be far worse.  And if you tell me that you will comply and report and that you're not going to fall back into the instinct to just try to get away with something more, which has served you dismally, then I will accept that with a GPS bracelet and allow you to report so you'll have more time to prepare.  But if -- if you cannot make that representation to me in all honesty, then the best I can do is let you self-report today to help improve where you're placed.

THE DEFENDANT:  Yes, I can do that.

THE COURT:  So you will self-report?

THE DEFENDANT:  Well, what you're offering me is two weeks with a bracelet?

THE COURT:  I'm not offering you anything.  I could just order you to self-report.  This is not a negotiation.  This is a question whether you will self-report.

THE DEFENDANT:  Okay.  Okay.  Okay.  Very well.  Oh, yes.

THE COURT:  All right.  The defendant, I do find, is not a substantial flight risk nor a danger to the community.  According

1    to the execution, a sentence of imprisonment is stayed until

2    September 18th, 2023, between the hours of noon and 2:00 p.m.,

3    subject to the immediate placement of a GPS.

4         I should ask whether or not there is one available at this

5    point.

6         PROBATION OFFICER:  I cannot say for certain, Your Honor.

7         THE COURT:  Then subject to reporting to the marshals for

8    custody and placement of a GPS bracelet at the first availability

9    when the defendant -- after which, the defendant is to report to

10   an institution to be designated, by further order of this Court,

11   between the hours of noon and 2:00 p.m.  The present release

12   conditions are continued until that date.

13        I will hear if there's anything more for the government.

14        MR. WEGNER:  No.  Thank you.

15        THE COURT:  Anything more for the defense?

16        MR. JONES:  No.  Thank you.

17        THE COURT:  I hope, Mr. Reyes, you can find a different path

18   going forward and live a law-abiding life.  I realize you have

19   challenges and you have had challenges.  There's consequences for

20   action, and this is, unfortunately, the one for you today.  I

21   wish you luck.

22        Thank you.

23        THE CLERK:  This Honorable Court stands adjourned.

24              (Proceedings concluded at 2:17 PM.)

25                          ***

1   I, PHILIP C. HARRELSON, Certified Realtime and Merit Reporter in and
2   for the State of Wisconsin, certify that the foregoing is a true and
3   accurate record, transcribed to the best of my ability, of the
4   proceedings held on the 17th day of August 2023, before the
5   Honorable William M. Conley, District Judge of the Western District
6   of Wisconsin, in my presence and reduced to writing in accordance
7   with my stenographic notes made at said time and place.

12                              Dated this 7th day of September, 2023.

18                              /s/Philip C. Harrelson

19                              Philip C. Harrelson, RMR, CRR
                                Federal Court Reporter

25  The foregoing certification of this transcript does not apply to any
    reproduction of the same by any means unless under the direct
    control and/or direction of the certifying reporter.